Good morning, may it please the court, counsel. I am Jacqueline Armstrong, and I'm here appearing on behalf of my client, Jacqueline Jurach, appealing the dismissal of Mrs. Jurach's entire employment discrimination case. The two issues that I am bringing to the court today for argument are the issue of whether or not the trial court had removal jurisdiction, our argument being that they took that action more than 30 days after their notice, and second, whether or not the trial court below properly applied the summary judgment standards to the facts before it on the failure to accommodate claim, the discrimination claim, and the retaliation claim. Under the federal removal statute, a defendant has 30 days from the notice of the fact that the plaintiff has a claim that could have been brought under the federal law within which to remove the case. In this case, it was the ERISA statute that prohibits an employer from discriminating and interfering with their right to benefits or retaliation for exercising those rights to benefits. We argue that the defendant took that action at least three months following the first notice, and arguably seven months after the first notice. We would claim that on May 23rd of 2013, when I took the deposition of the chief financial officer, Michael Andrew, and discussed with him the issue of cost-cutting during their cost-cutting phase, and I brought up whether or not premiums and, you know, the costs of health care benefits and the usage of those benefits by employees was of concern to him, and he agreed. That was in his deposition on May 23rd, 2013. Arguably then, and the case that I cite in my brief indicates that the defendant's subjective own knowledge can act as the trigger for the removal. So by June 23rd, we would argue that that would be the deadline for Safety Vision's removal action. Nevertheless, on September 23rd, I amended the plaintiff's petition to add a claim for intentional infliction of emotional distress, and in writing that petition, in my opening introduction to the petition, I added the newly discovered evidence that it was also of concern to Safety Vision and a motivation for their termination of my client, that she had been used, she had cost the company, you know, increase in premiums, and that was September 23rd. And again, the removal did not occur within 30 days of that date even. On October 17th, I took the deposition of Charles Garrett, who was another disabled individual who was terminated at the same time as my client. He had been a cancer patient, and because of that, the vice president of Safety Vision addressed him when he was joining the company and asked if he would remain on COBRA from his former employer so that they could avoid the additional costs of putting him on their insurance and the potential that he might relapse into his cancer, come out of remission, and therefore cost the company a good deal of money, the vice president stating that they're just a small company. So Mr. Garrett agreed, and the employer took up the payments of the premiums on the COBRA policy. But as soon as Mr. Garrett's COBRA benefits expired, within weeks, he was included in the reduction in force. JUSTICE SCALIA. Let me ask you. Following the removal of the case, is not the remand sought as an alternative to the amendment? It seems like that's a pretty important—I mean, they make a waiver argument here. JUSTICE GINSBURG. I understand the waiver argument. From my point of view, when I was drafting that brief, I was going back and forth, and those—the order of that argument was interchangeable regularly, because I was arguing in the alternative. It could have just as easily been arguing in the alternative that, you know, that the ERISA claim did not completely preempt. That was my primary concern. I had to prioritize what this particular judge might do in terms of holding on to the case, and if she believed their argument, then I would lose all of my discrimination claims. And I was so nervous about that, I wanted to address the complete preemption first and foremost, and then plead in the alternative, as is allowed under Rule 8, the motion to remand. JUSTICE SCALIA. Do you agree that the order in which the relief is sought might be important here if you contesting jurisdiction by way of a motion to remand, there might be implications? JUSTICE GINSBURG. An implication, an inference, maybe, but certainly not what I was intending, and certainly not what I believe Judge Rosenthal understood to be happening in this instance. You know, I think my request that the case be remanded was made clear, and we had an oral argument on that point. I made very clear that—and stated the law at that time—that any doubts as to Federal jurisdiction should be in favor of remand. And I did make that clear. It's just a very simple, straightforward time. They're outside the 30-day window, and I trusted Judge Rosenthal to make that determination based on the clear facts of the situation, the timing, because the timing was very clear, overwhelming. It was untimely by a matter of months. Okay. So then the defendant had notice then as early as October. There was no removal. And then we filed amended disclosures that again repeated the same evidence. And at that point then, Safety Vision jumped at the opportunity to remove the case. This was after discovery had been completed. In fact, it was on the eve of my response being due to their motion for summary judgment. So we asked the court to reverse the case and direct the court below to remand this to state court. I think you said you wanted the remand, and you at least intended, even if the—I think what matters is how the pleading was framed, because who knows what the lawyers intend? You just look at what they file. But I think you said you intended for the remand to be your main issue there because you thought you knew your discrimination claims were in trouble if it stayed in Federal court. Why is that? Because of the compelling arguments that my opposing counsel had been making on complete preemption, that most of my client's issues and discrimination would be subsumed by hitting that third rail of ERISA. And I argued that first and foremost. I don't think my concern was with the level of evidence that I had that it was going to be, you know, entirely fatal. There was a chance that we would be able to proceed. So, you know, it was literally in the balance. I don't think the laws cited, the cases cited by my opposing counsel, you know, create the argument that we waived the remand because all of those cases, they all talk about the plaintiff having been engaged prior to, you know, engaged and participated in the Federal case before that time. My client, we did absolutely nothing. We didn't even submit a complaint. The issues were presented to the court, argued to the court within the same limited time frame, and, you know, and they were pled as an alternative. There is no priority to be given when pleading in the alternative. The court gets both arguments and can make the decision based on the law. Okay. I'd like to move on now to the dismissal of the disability claims. My client suffering from a permanent disability that causes intense sensitivity of her eyes to fluorescent lights. The claims were brought as a failure to accommodate discrimination and a retaliatory discharge. The concern and problems that we have here and the reason for our appeal is the egregious misapplication of the summary judgment standards applied by the trial court below to the facts that were before her. The law is clear that the judge is not to engage in any weighing of the evidence, not judging the credibility of witnesses, or engaging in any inferences, drawing any inferences from the facts. That is the province of the jury. And there is no way that the court could have dismissed these claims without abusing that standard. Okay. The judge went so far as to ignore and misconstrue and discount ample evidence in the record and even finding facts in the record that did not exist. From the very beginning of her account of the facts, the judge talks about and determines that Safety Vision engaged in good faith efforts to identify and offer reasonable accommodations to my client and then goes through a series of facts stating that various office moves were because of my client's first complaining and then Safety Vision considering, reviewing the situation, and then providing an accommodation. And the court cites to my client's affidavit. If you go back to those very sites, they talk about moving Ms. Drach from a cubicle near windows to a large interior office that she shared with a co-worker, and the court says that this co-worker was unwilling to turn out all the lights. That's nowhere in the record. My client hadn't even complained at that point. She was still trying to ascertain what the cause of her disability was. The reason she was moved to that larger interior office was, according to the record, because a returning employee who had an irritating cough, they wanted to, they had, you know, employees were complaining and wanted him moved as far away from them as possible, so they were going to put him in Ms. Drach's cubicle, and that's the reason she was moved. It wasn't because of an accommodation or any complaints. Again, the court then goes to the cube, to the interior office, and says that she complained about being in that interior office. There's no evidence even that she communicated regarding the discomfort in that office. Yet the court then says that another example of the employer accommodating was to move her to a small interior office. The reason she was moved to that small interior office was in no way related to an accommodation. That was because the chief of the engineering department decided he wanted all the engineers in the same area, and so Mrs. Drach swapped with the engineer that was in that small office. So that accommodation was accidental. Then they moved her to an area after she had complained and after she had put them on notice and had been requesting numerous times to be placed in an area where she did not have to be under fluorescent lights, nor did she have to work in the dark in cave-like conditions under a pool of light. Then they move her to an area knowingly surrounded by, as we describe it, a sea of fluorescent lights, causing her excruciating pain and migraines. Those facts are not in dispute at all that she was in pain. Never did Safety Vision knowingly engage in an interactive process with her. The record is replete with citations to emails, communications with her managers, multiple managers about this disability. The fact is that Safety Vision never trained its management on how to respond to requests by disabled employees for accommodations. She was ignored, completely ignored. For years, she was ignored. And only when she took that to the senior management did they decide to put her and terminate her. For the discrimination, there are two ways that Mrs. Drach could have gotten to a trial, either by mixed motive or by proving a pretext that the reasons for the termination were false. Mrs. Drach pled for declaratory action, for injunctive relief. That's the first thing she wanted when she came to me, was to establish that she was not in the wrong, that she was correct, and that the company should have accommodated her. All that is needed to show in a mixed motive case is that a motivation for the inclusion in the reduction in force was her disability. And the record is full of that evidence. The failure to accommodate in the past, no training or process for responding as required by law, the other cancer patient, the testimony on the increased premiums, and the fact that her immediate supervisor had to resort to secretly trying to find an accommodation for her and not letting the two decision makers find out about it. I'll reserve the rest of my time for rebuttal. Thank you. Thank you, ma'am. May it please the Court, let me start with the first issue, the removal issue. We think the removal was timely. We'll stand by our briefing on that. But more dispositively, frankly, is the waiver argument. And, of course, this Court in Harris said that if the plaintiff participates in the federal court proceeding, that's a waiver of the timeliness objection. Not only did Ms. Jurek participate, she embraced federal jurisdiction. She filed with me a joint discovery case management plan explicitly stating that federal jurisdiction existed under ERISA section 510. Then she filed the motion that sought leave to amend to bring a federal claim under ERISA section 510 and only an alternative motion to remand. And the proposed order that she submitted to the Court only sought permission to amend. We didn't object to that, and Judge Rosenthal granted it. So she embraced federal court jurisdiction, and hence, the removal was appropriate. Second issue is the termination. Her claims for termination are disability discrimination and retaliation. Now, the causation standard is a little different. Under retaliation, it's but-for causation. So the motivating factor standard that she articulated doesn't apply to a retaliation claim. But for disability discrimination under the TCHRA, motivating factor does apply. I didn't really see this case as a motivating factor argument. Frankly, it's a pretext case, all right? But under either standard, there's not sufficient evidence to get there. Under either model, the first step would be a prima facie case, and for purposes today, we concede that. Next step is the defendant has to articulate a legitimate, non-discriminatory reason for termination. Safe Division said a reduction of force. In fact, we presented evidence that 24 individuals were laid off in a three-wave reduction of force in 2010. Further, we actually articulated specifically why Ms. Jurek was included in that third part of the reduction of force. Specifically, there was a five-member marketing department. At the time, the manager was Chanelyn Bilber, who she described as compassionate and kind and not dismissive of her request for accommodation. There was two males. One did technical writing. One did graphics. So they had specialized skills that everyone agrees needed to be kept. And that only left Ms. Jurek and Ms. Melissa Fote. Ms. Melissa Fote, even Ms. Jurek knew, got paid less than her. And the company all agreed. Her immediate supervisor agreed, even though he was not the decision maker. But he said, yes, he agreed. Mr. Smith, the owner of the company, agreed. And the CFO, Andrew, agreed. When it comes down to between Ms. Jurek and Ms. Fote, when we're trying to save money here, we're going to let go the person who gets paid more. And we're going to have Ms. Fote absorb her duties as a trade show coordinator. And that's precisely what happened. And that dynamic is not unusual in the context of this RIF. There was numerous examples on the record where other people were let go as part of the RIF, and their job duties were absorbed by somebody who was paid less so that the company could save money. So has the company articulated a legitimate, non-discriminatory reason for termination? Absolutely. It's all in the record. We've now proceeded to the final stage in the analysis. Did Ms. Jurek present evidence that that reason is a pretext for disability discrimination or for retaliation? And the case on the Fifth Circuit says it has to be substantial evidence. And the answer is unequivocally no. We went through her five arguments that she has in an attempt to meet that burden. And I'll stand on the briefing on that. But I wanted to kind of emphasize some evidence that really clarifies and crystallizes how clear the answer is no to that question, that there is no evidence of pretext, and also no evidence that disability was a motivating factor in the decision to include her in the RIF. The first thing is, Ms. Jurek admits that when she interviewed at the company, they told her, let's start in November 2005. Turns out the day she was supposed to start, she got a detached right retina. She called and the company agreed to extend her start date until January so that she could recover from that. Furthermore, she concedes that when she started in January 2006, she needed a bigger monitor because of that eyesight issue. They got it. She needed time off to go to a doctor. She got it. She needed to work a part-time schedule. She got it. This is not an auspicious start to a disability discrimination failure to accommodate claim. My point is this. There was also times over the years where she asked for other things and got it. My point is this. Logically, it makes sense that if the company was really discriminating based on disability or request for accommodation, they wouldn't have waited four or five years to do that. The thing that drove, that was the true impetus, and it's clear from the record for her determination, was the economic decline that caused the 24-person reduction of force. So that's the first piece of evidence that I think only bolsters Judge Rosenthal's grant of summary judgment. Second thing is, Ms. Jurek wasn't targeted for the RIF. Okay, she'd been asking for accommodations and pointing out her eyesight problems for a long time. There was two waves of RIF where they cut some of the clear fat and underperformers, and she was not an underperformer, we never said she was, until we got to the third stage and we're kind of cutting muscle. She wasn't targeted. The third thing is, what's interesting is Ms. Jurek became the trade show coordinator, a stand-alone position, in May 2007. The company was formed in 1993. Between 1993 and May 2007, the trade show coordinator position was never a stand-alone position. It was only in May 2007 that they made it a stand-alone and gave it to Ms. Jurek. So by doing what they did in October 2014, namely terminating or laying off Ms. Jurek and having Ms. Fote absorb those duties along with the duties she was already performing, all the company was doing was reverting back to the way that they had operated in that context for 14 years previously. The next thing is, you know, she points out, well, one of the other people terminated had cancer. That's true out of 24 individuals. The only other individual who was terminated who arguably had any disability was Mr. Garrett and he had cancer. But it's undisputed that the company hired Mr. Garrett knowing he had cancer. Mr. Garrett testified to that. In addition, Mr. Garrett testified that the company was, quote, accommodating of his condition. He testified to that as well. Moreover, after the RIF ended, the company continued to employ, and this is in the record, two individuals with cancer, another with a heart condition, and another person named Nathan, who's been with Mr. Smith and Safe Division for many years, who has a chronic medical condition that continually requires him to use crutches. So there's simply no evidence that the company was out targeting anybody because of a disability. Final point is this. In her deposition, if you really read it, it got down to the point where I was kind of like mystified as to why she's bringing this claim. And I said, you're not claiming that because of your eye condition, you were immunized from an otherwise legitimate reduction of force. And she said, I am claiming that. So I think it's kind of insightful that the plaintiff herself, and we quoted this in her brief, says, I think I should have gotten preference in the selection process because it would be harder for me to get a new job. And of course, that's not the law in a disability discrimination case or retaliation case. There has to be evidence of disability discrimination or retaliation. And in this case, there is none. And so for all those reasons, we believe that Judge Rosenthal properly granted summary judgment on the disability discrimination claim and the retaliation claim. And frankly, when you compare and contrast this case with cases where summary judgment was reversed on a pretext issue, once again, that only clarifies and crystallizes that the conclusion the judge reached was correct. For example, EEOC versus Chevron Phillips, Judge Dennis authored that case. And that's a case where the plaintiff asked for an accommodation. And then the company, instead of engaging in any sort of interactive process, went through rifling through her file to try to show that she didn't report chronic fatigue syndrome, which they didn't even ask her about when she first came on with the company. And a reasonable jury could certainly have concluded that they were acting in bad faith. More recently, Goodo versus National Oil of Arco, a long-term employee allegedly terminated for poor performance. And Judge Costa, you noted, in reversing summary judgment. Well, the company had a history of progressive discipline. Yet on this particular employee, he was given one warning. And then the next thing you knew, he was given four warnings all on the same day, none of them signed by him. Only the last one, not even signed by the company, for alleged performance problems, some of which took him to task for things that were not even within the scope of his job responsibilities at the company. My point is this, in cases where summary judgment is reversed on a pretext issue, often the evidence really doesn't even pass the smell test. This is a case, this is a horse of a different color. Not only does it pass the smell test, I think it's bulletproof. So the last issue is the reasonable accommodation claim. And in addition to our briefing on this point, I think there's some other important points on this claim. Because a reasonable accommodation claim is a little mushy. It's not as amenable to a kind of clear analysis, perhaps a termination claim. So there's some things I think that are important that are in the record that I wanted to point out in my time here today. The first thing is before, it was August 31st or September 1st, 2010, when Ms. Jurek and the rest of the marketing department moved upstairs to a two-story building. And they were putting cubicles next to this large open window. Everybody agrees with that. Okay. Well, immediately before that move, Ms. Jurek was in an office, a private office, without any natural light. There was no window, right? She complained about that. And she said that moving to an open office that an engineer had recently left the company with natural light would be better for her eyes. And she wanted that. So when she moved upstairs next to the window with the natural light and started complaining about that, we were naturally mystified. And I even told her, or even came up at her deposition, when I said, well, now you're moving back into a private office without natural light, and she agreed, that would have been no different than the office you already had downstairs that you didn't like. That was a deposition at page 230, record at page 372. So there's, as Judge Rosenthal kind of alluded to, there's kind of like mixed messages here going on, which naturally then is why Mr. Andrew, the CFO, said, you know what? Just get us a doctor's note. Hopefully that will be a source of clarification. And she got a doctor's note of September 20th, and we admit that she provided that, I think it was on the 27th of 2010. And that note doesn't say anything about any sort of accommodations. It just says she has a condition, she's sensitive to light. Mr. Andrew says he called the doctor's office, because the doctor's office note said, if you have any questions, call me. And they gave him some ideas. And he actually had those ideas implemented. Specifically, contrary to the claim that the company did nothing to accommodate, even Ms. Jurek concedes that they took out at least one, maybe two of the fluorescent lights above and behind her work area upstairs, so that it would be less lighted. And ironically, it's in her deposition. That's exactly what occurred at her deposition at her lawyer's office, when she was deposed for about seven hours, is that those fluorescent lights were dimmed. Okay? Secondly, later on in September, it was her boss, Chandler Dilber, suggested, why don't you work at home for a while? Give me a proposed schedule. She gave him a proposed schedule to work at home a half day, two days a week, and then one full day during the week. Mr. Dilber said, sure, that's fine. Okay, so they did do things. If she still wasn't happy, she needed to get a note that said, I'm entitled to a private office. And fundamentally, that's what Ms. Jurek coveted. She wanted to take that media slash marketing office and make that her private office. Absent a doctor's note, that didn't happen. Another thing that's interesting, I think, is I just started brainstorming myself in her deposition, whoa, did you ever ask for this? Because it's supposed to be an interactive process. Okay? And especially when you're dealing with an alleged disability like this, it's not necessarily open, obvious, and apparent as to what she needs. All right? She's claiming she can do her job, and she did do her job fine. She's claiming she had headaches from time to time. She's saying light, all different types of light give her problems, especially fluorescent light. If the company did things, it's an interactive process. It's a joint requirement. So I asked her, well, did you ever ask, everybody just open up the, there's some blinds there, on the open window, and just turn off the fluorescent lights and just work on the natural light? And to the extent that doesn't work, people could have lamps. She said, no, I didn't ask for that. In his deposition, Dilber said if she had asked for that, there's no reason he wouldn't have granted it. So historically, prior to the move up to the second floor, she concedes, as I've discussed some of them, that the company made numerous accommodations for her. After she moved up to the second floor, she admits the company made accommodations for her, the work at home, taking the rods out, all right? The only thing Ms. Jurek ever did was repeat that she wants that media room, that marketing office to herself. We think if there was a breakdown in her active process, it was attributable to Ms. Jurek, not to the company. Last couple of points are this. Kind of the theory of her case has been that Dilber, her immediate manager, is a kind, compassionate person who did not, she conceded, did not ignore her request for accommodation. But really, the bad guys are the CFO, Andro, and the owner and president, Bruce Smith. But when you read the record, what becomes obvious is about 95% of her interactions were with Dilber. So if he's the good, compassionate guy, well, those are 95% of her actions. I think the only time she went to Smith was on September 2nd, which is like the second day she was up on the second floor, and she said, I'm not sure this is going to work for me. I don't think this is going to work. And he said, give it a try. Seems reasonable. She never went back. That's it for Smith. On Andro, as far as I can tell, his only real involvement was on the doctor's note issue. So this notion that they're the bad guys, they had very little to do with this. In addition, I think it's important to note that Chandler Dilber was a former employee when he was deposed. He hadn't been with the company for about a year. He didn't get any sort of severance package. He had no dog in the fight at all. I had never talked to him. This is in the record. I had never talked to him before he walked in on his deposition. Kind of the hints I was getting was, this guy is going to be the deep throat witness for us. He's going to blow all the evilness of the company up. And you're going to see. Well, read his deposition. He is a very kind and compassionate person. He was almost apologizing to Ms. Jurek, who was there when he was being deposed, for saying, yeah, you know, you were the most logical choice to terminate. I feel almost embarrassed and a little bad saying that. But it is that apparent. And he also said, even though he had daily meetings with Andro and Smith in the morning, they never once said anything bad about her. Let's go get her, or anything like that. So in short, and in sum, we think, A, the case was timely removed. But B, more importantly, even if it wasn't timely, the plaintiff waived injection of time to us so we're properly in federal court. B, either under the but-for standard for retaliation or motivating factor alternative for disability discrimination, any way you slice it, on the termination claims, the company articulated a legitimate non-discriminatory reason for termination, said it's a RIF, we proved it was, identified why she was selected. It all makes sense. The burden shifted to the plaintiff to show evidence, a pretext, substantial evidence, or, at least on the disability point, some motivating factor evidence of disability discrimination. She didn't do either, so summary judgment was properly granted on that. And then finally, even though it's a little bit more factually intensive, once you really go through it on the reasonable accommodation claim, summary judgment was properly granted as well. So for that reason, we respectfully request that the court affirm, in all respects, the district court's opinion. Thank you. Thank you, Mr. Lurdy. Ms. Armstrong? Thank you, Your Honor. First of all, whatever Safety Vision might have done earlier by allowing her to start late or whatever, whatever accommodations they claim, the disability that was never accommodated was her sensitivity to the fluorescent lights. The larger monitor that they gave her had nothing to do with her disability. They were giving monitors to everyone. What about taking out some of the fluorescent lights, or there were fewer? Any lights. She knows what her pain, what caused her pain, and they were not listening. They have tried to impose a credibility determination on the court below, and they're asking you to do the same thing. By making her out to be a complainer and a whiner and somebody that coveted a private office, this woman was in pain. And the only people that should be making that determination are the people on the jury, when they can see the witness live and hear her testify and talk about the discomfort that she was in, not allow the employer to impose over onto my client some sort of petty covetousness over private space. The disability is not in dispute. Her sensitivity to light is not in dispute. That's in the record. The fact that she kept asking and asking and asking for those accommodations and the fact that she was ignored, and not just ignored, but pushed back, caused her to stop asking. Caused her to work in a dark space with a pool of light like this, with all the lights turned out, with a door open a crack, with her employers observing her in that situation and still ignoring her requests to engage in interactive process. None of those managers even asked her for medical support. They just ignored her. And so she suffered silently, because this was not the last best chance for this woman to have a job. This was her last chance to have a job. And she understood how important that was. With her husband more than 10 years older than she, progressively deteriorating with arthritis, she was going to have to support the family. She had a lot to lose. And this was the only way that a disabled individual can look at the surroundings and find the best accommodation. She did not want to rock the boat that much. She instinctively understood that Andrew and Smith did not want to address her disability. And so she didn't push it. And as soon as she did push it, there was a problem. And she was terminated. Her instincts were correct. Chalim Dilber, who observed her in this room, on his own said, this is really terrible that you're working in the dark. Let me bring a lamp for you from home. And he was a nice guy. And he did try to go to Smith and Andrew. That's in the testimony that he gave. But he stopped doing that. And he stopped doing that for a reason. And the jury can infer from his drawing back and then engaging in secretive efforts, well, we won't tell them what you're doing. We'll tell them that you're doing a project for me. We won't tell them you're working from home. We'll just say you're doing something for me. And he stopped pushing that with Smith and Andrew because he instinctively knew. The jury should have been able to infer that from the facts, not the judge and not this panel. With regard to the retaliation and the but-for causation, there can be more than one but-for causation. And we would argue that, you know, in addition to, you know, even if those pretexts are true, the stated claim that there was a reduction in trade shows, there was no reduction in trade shows. The evidence shows that. Bruce Smith and Michael Andrew both agreed that trade shows were very critical to the functioning of their marketing. That was the biggest bang for their buck. And within a couple of months of Bruce Smith telling my client she did not have to fear losing her job, he did a turnaround and said, well, we can do without you. We're going to consolidate these roles. Those roles had been consolidated years before, years before they realized this is the biggest bang for the buck, years before Michael Andrew was even employed by this company. She was a critical person in a critical role, and they gave that role to a recent college graduate who was not qualified for the position, not making that much less than Mrs. Jurok. And the evidence shows that she was completely overwhelmed in the role. Charles Garrett testified that there would be no way that Ms. Fote was qualified to take on that position, which required her to, you know, oversee the these seasoned salespeople. We request reversal and that the case be remanded to state court. Thank you. Thank you, Ms. Armstrong. That concludes the arguments for this week.